[Cite as *Brown v. Brown*, 2021-Ohio-1932.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**UNION COUNTY**


JASON R. BROWN,

     PLAINTIFF-APPELLANT,          CASE NO. 14-20-24

     v.

MEAGHAN J. BROWN,               O P I N I O N

     DEFENDANT-APPELLEE.


Appeal from Union County Common Pleas Court
Trial Court No. 16DR0141

Judgment Affirmed

Date of Decision: June 7, 2021


APPEARANCES:

    *Rocky Ratliff* for Appellant

    *Natalie J. Bahan* for Appellee

Case No. 14-20-24

**SHAW, J.**

{¶1} Father-appellant, Jason R. Brown ("Jason"), brings this appeal from the September 22, 2020, judgment of the Union County Common Pleas Court designating mother-appellee, Meaghan Brown[1], residential parent for school placement purposes of the parties' child, J.B. On appeal, Jason argues that it was not in J.B.'s best interest to modify a term of the shared parenting plan ("SPP") and designate Meaghan as residential parent of J.B. for school placement purposes. Further, Jason also appeals the award of $622.50 in attorney's fees to Meaghan for an "eleventh hour" continuance requested by Jason's attorney, which moved an impending supplemental hearing date.

*Background*

{¶2} The parties were married in Tennessee in June of 2014. They had one child together, J.B., born in February of 2015. Pursuant to a negotiated agreement, the parties' marriage was terminated by a decree of divorce on February 7, 2017. At that time the parties also entered into an agreed SPP, which was approved and adopted by the trial court.

{¶3} The SPP designated both parties as residential parent of J.B. Further, the SPP provided parenting time two days each week to Meaghan, two days each week to Jason, then alternating three-day weekends for each parent. As J.B. was

---

[1] Meaghan has remarried and her last name has changed; however, the case is still styled with her name as Brown.

too young to be in school when the SPP was entered, the SPP provided that the parties should cooperate with regard to schooling when J.B. came of school age.

{¶4} In addition, under the SPP, if one of the parties relocated, that party was required to promptly notify the trial court. In the event that a party did relocate, the trial court could schedule a hearing on its own motion or at the request of the non-relocating party to determine whether it was in J.B.'s best interest for the SPP to be revised.

{¶5} At the time of the divorce, Jason and Meaghan were living approximately fifteen minutes apart, with Meaghan residing in Marysville, Ohio, and Jason residing with his parents in Raymond, Ohio. Jason's parents owned a large home and he used the lower level as his residence. Prior to the relationship ending, Meaghan resided with Jason and his parents as well.

{¶6} In February of 2018, Meaghan filed a notice of intent to relocate from Raymond, Ohio, to West Chester, Ohio, in the Cincinnati area. Meaghan was in a relationship with a man who lived in the area. After she initially moved, Meaghan was commuting to a nursing job in Marion, so the parenting schedule still worked. Eventually, Meaghan finished her nursing degree and got a job in the West Chester area. At that point, exchanges with J.B. were conducted at a halfway point between the parties, in Springfield, Ohio.

{¶7} On December 5, 2018, Meaghan filed a motion to modify the SPP, stating that a modification of the SPP was in J.B.'s best interest. Meaghan stated that she had moved from Marysville to West Chester for employment-related reasons. The motion stated that since Meaghan had moved the parties had continued executing the SPP; however, Meaghan believed it was in J.B.'s best interest to be enrolled in pre-school. The motion stated that given the distance between the residences, pre-school enrollment would necessitate a revision to the terms of the SPP. Meaghan desired to be designated residential parent for school placement purposes; however, she noted that she did not want to limit Jason's parenting time more than necessary, and that she would consider increases in Jason's parenting time during periods when J.B. was not in school.

{¶8} On January 8, 2019, Jason filed his own motion for modification and/or termination of the SPP. After both parties had filed their motions, a GAL was appointed for J.B.

{¶9} A hearing was held before a magistrate on the parties' motions on July 9, 2019. During the hearing, the parties narrowed the issue before the court. Despite both parties having filed motions to modify the SPP, the parties clarified that they wished the SPP to remain in place. The parties indicated that they simply wanted the trial court to determine who should be residential parent for school placement purposes *only*. The GAL had recommended a change in the parenting time schedule

that would coincide with J.B. attending school, and both parties seemed to be fine with the schedule; however, both parties wished the schooling to be done in their area. Given that the parents lived nearly two hours apart, a decision would have to be made as to where J.B. would attend school.

{¶10} The GAL testified at the hearing and reiterated her position from her written report, stating that she felt Jason was the better option as residential parent for school placement purposes due to consistency of living in the Raymond area. She also felt that Jason had a good family support system around him.

{¶11} Meaghan then testified at the hearing that J.B. was adjusted to her residence in West Chester just as she was to the home in Raymond. Further, Meaghan testified that she had remarried and that she had a good family support system in her area through her in-laws, which she felt the GAL did not take into account in her written report. In addition, Meaghan testified that she was going to be undertaking "PRN" status at work, which meant she only had to work two days out of every six weeks to keep her license active. She indicated that she could schedule those days when Jason had parenting time, and effectively be a stay-at-home parent for J.B.

{¶12} Meaghan also detailed some issues that she had with Jason over the years, such as Jason excessively taking J.B. to the doctor. She testified that Jason did not tell her about many of the visits as they happened, and that she only learned

of them when she received an "explanation of benefits" from insurance. In fact, she testified that at one point J.B. had a catheter for a urinary tract infection and Meaghan was not informed.

{¶13} In addition, Meaghan testified that Jason did not offer her the right of first refusal for parenting time pursuant to the SPP even though he should have based on the wording of the SPP. Nevertheless, Meaghan testified she thought Jason was a good father and she did not want to limit his parenting time unnecessarily, she just wanted J.B. to be in school.

{¶14} The hearing was continued to a second day: August 16, 2019. On the second day of the hearing Jason provided testimony that he had lived in the home with his parents in Raymond since around 2000. He indicated his parents were available to care for J.B. if necessary and that his sister only lived ten minutes away. Further, he testified that he went to North Union schools and he wanted J.B. to go there. In addition, Jason testified he had gotten a new job with work hours of 7:30 a.m. to 4:30 p.m. However, he testified that he could work from home at times, which would allow him to be there for J.B. if she had any issues. At the conclusion of the hearing, the parties submitted written closing arguments.

{¶15} On December 27, 2019, the magistrate issued a lengthy written recommended decision on the matter that contained numerous enumerated factual findings leading to the magistrate's conclusions of law. Ultimately the magistrate

disagreed with the GAL's recommendation that Jason was the better option to be residential parent of J.B. for school placement purposes because Meaghan could modify her schedule as a nurse to only work when J.B. was with Jason, thus allowing her to care for J.B. at all hours. The magistrate also felt that Meaghan had a strong support system around her. The magistrate felt that the GAL restricted a support system to only blood relatives, which did not reflect the reality of many families. Therefore Meaghan was recommended to be residential parent of J.B. for school placement purposes.

{¶16} On January 10, 2020, Jason filed objections to the magistrate's decision. In his objections, Jason gave responses to each of the magistrate's enumerated factual findings. He did not contest many of the magistrate's broader factual findings; however, he did argue that the evidence disputed Meaghan's claim that her work schedule could be such that she was effectively a stay-at-home mother. Further, and more importantly, Jason disagreed with the magistrate's recommendation that Meaghan should be named residential parent of J.B. for school placement purposes.

{¶17} On January 22, 2020, Meaghan filed a response to Jason's objections to the magistrate's decision. In the response Meaghan brought to light two new issues: that her employment status had officially been altered so she was on "PRN" status, and that the home Jason had lived in with his parents in Raymond had burned

down. The home, which Jason argued J.B. was adjusted to, was a "total loss" and resulted in Jason and his parents moving to Huntsville.[2]

{¶18} After reviewing the objections to the magistrate's decision and the response to the objections, the trial court filed an order stating that the new issues raised in Meaghan's response necessitated a further, supplemental hearing as the issues raised were germane to the trial court's ruling on the objections. Thus the trial court set the matter for a hearing on those limited issues to supplement the prior hearing. However, due to, *inter alia*, covid-related restrictions, the supplemental hearing was delayed for several months.

{¶19} The hearing on the supplemental issues was scheduled to convene June 29, 2020. However, on June 26, 2020, Jason filed a motion to continue, stating that J.B. had disclosed she had been inappropriately touched by Meaghan's husband. Because of this, Jason requested a continuance of the supplemental hearing. He also requested that the GAL be reappointed and that time be provided to allow the GAL to investigate the matter.[3]

{¶20} According to the record, the magistrate orally granted the motion to continue the hearing immediately; however, a magistrate's order was not filed until July 27, 2020. In that order, the magistrate stated that Jason's motion had been granted, and that the GAL should supply a supplemental report seven days before

---

[2] On January 29, 2020, Jason filed a notice of intent to relocate to Huntsville, Ohio.
[3] Notably, the motion's certificate of service was addressed to the wrong attorney.

the final hearing. However, the magistrate stated that due to the eleventh hour of Jason's request, Jason would be required to pay Meaghan's attorney's fees for preparation for the hearing as a result of having to continue the hearing. The magistrate stated that Meaghan's attorney had ten days to file a request for fees incurred in preparing specifically for the June 29, 2020 hearing that did not occur. Finally, the magistrate reiterated that the supplemental hearing in this matter would be limited to only the two issues set forth in the trial court's January 27, 2020 order.[4]

{¶21} On August 6, 2020, Meaghan's attorney filed a request for attorney's fees consistent with the magistrate's order. A motion attached stated that Jason's continuance request was calculated to delay review of the magistrate's decision and to prevent the trial court from adopting the magistrate's decision. Further, Meaghan's attorney argued that the allegations against Meaghan's husband had been investigated by multiple sources and were found to be unsubstantiated. Meaghan stated that her husband had taken and passed a polygraph examination, and that a law enforcement investigation was closed on the matter. As to the attorney's fees, Meaghan's attorney attached an invoice for the hours billed with regard to the June 29, 2020 hearing. The invoice established that 4.5 hours had been worked for a total bill of $810. An additional .5 hours was worked with no bill.

---

[4] Jason filed objections to the magistrate's decision on July 27, 2020, setting terms for the continuance. The trial court overruled the objections the next day, finding that they were filed late outside of the rule, and that the filing was not appropriate in any event.

Meaghan's attorney filed an affidavit stating that the bill was true and accurate to the best of her knowledge.

**{¶22}** On August 12, 2020, the magistrate filed an order awarding Meaghan's attorney $622.50 in attorney's fees. The magistrate stated the fees were being awarded "based upon Father's unsubstantiated allegations of sexual abuse regarding the parties' minor daughter." (Doc. No. 102). The magistrate reduced the amount requested for attorney's fees by one billed hour because that hour was unrelated to preparing for the June 29, 2020 hearing, which is the *only* issue the magistrate felt Meaghan should be compensated for.

**{¶23}** On August 17, 2020, the GAL filed a written supplemental report indicating that Meaghan's husband had in fact taken, and passed, a private and a regular polygraph examination. The GAL's report also noted that in the alleged disclosures made by J.B., she referred to her stepfather as "monkey boy," which was a name that Jason—and perhaps only Jason—used for the stepfather. The GAL recommended that the court's prior orders remain in place, but she added that stepfather should remain away from J.B. until all investigations were completed.

**{¶24}** On August 24, 2020, Jason filed a motion to "set aside" the magistrate's order granting Meaghan's counsel's attorney's fees in the amount of $622.50. He argued, *inter alia*, that no evidentiary hearing had been held with

regard to J.B.'s disclosures, thus the magistrate's determination that the allegations were "unsubstantiated" was improper at that time.

{¶25} The trial court reviewed Jason's motion to set aside the magistrate's order with regard to the attorney's fees and found that the "unsubstantiated" finding related to the allegations against the stepfather was supported by the record and that the attorney's fees were appropriate and equitable for the limited purpose they were given in this matter.

{¶26} The supplemental hearing that the trial court had ordered in January of 2020 was finally held August 21, 2020, before the magistrate. Following the hearing, the magistrate filed a supplemental decision, stating that the evidence established that Jason had been living with his parents, that the home had burned down, and that Jason was currently residing in a different school district than the one he wanted to send J.B. to initially. However, Jason had open-enrolled J.B. in North Union and wanted her to attend that school. Further, the magistrate determined that the evidence showed that J.B. had been going to "Lakota" schools in the area where Meaghan lived. In addition, the evidence showed that Meaghan's employment schedule had been altered so that she could be home with J.B. No objections were filed to the supplemental decision.

{¶27} On August 24, 2020, Jason filed a new request to modify custody and for an evidentiary hearing, stating that J.B. was unsafe in Meaghan's home due to the allegations made against Meaghan's husband.

{¶28} On September 22, 2020, following the supplemental hearing, with all the evidence now before it, the trial court filed an entry denying Jason's objections to the magistrate's decision.

{¶29} Also on September 22, 2020, the trial court filed a lengthy written final judgment entry and order on the matter. The trial court independently reviewed the matter and ultimately concurred with the magistrate, finding that it was in J.B.'s best interest that Meaghan be designated residential parent of J.B. for school placement purposes. It is from this judgment that Jason appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred when it denied the Plaintiff/Appellant's Motion for Custody and Request for Evidentiary Hearing.**

**Assignment of Error No. 2**
**The trial court erred when it failed to award custody of the minor child to the Plaintiff/Appellant.**

**Assignment of Error No. 3**
**The trial court erred when it awarded defendant attorney fees.**

*First Assignment of Error*

{¶30} In his first assignment of error, Jason argues that the trial court erred in this matter by "denying" his August 24, 2020 motion for custody and his request

for a related evidentiary hearing. In the alternative, he argues that there is no final appealable order here because his newly filed motion for custody remains outstanding.

{¶31} Importantly, the trial court specifically addressed Jason's newly filed motion for custody in a footnote on page 8 of its final judgment entry. "The Court notes that subsequent to the trial, while awaiting the objection period to pass, Father filed separate Motion for Custody and Request for Evidentiary Hearing. That matter will be set in due course as it raises issues not litigated in the present action." (Doc. No. 119).

{¶32} Jason argues that the trial court's order leaves an issue open for litigation, rendering this action incomplete. However, Jason's new custody claim is independent of the current litigation related to which parent would assume the role of residential parent of J.B. for school placement purposes. Instead, his new motion represents a claim for modification of custody as a whole. *See Denkewalter v. Denkewalter*, 9th Dist. Medina No. 13CA0082-M, 2015-Ohio-3171, ¶ 9 ("A parent can always invoke the continuing jurisdiction of the domestic relations court to consider reallocation of parental rights.").

{¶33} Importantly, the matter before us, namely who should be residential parent for school placement purposes, has concluded. The separate and newly filed custody matter will be litigated in the future, if appropriate and necessary, and it can

be appealed at the conclusion of that litigation. The new, separate issue does not render the current judgement incomplete, or make it a non-final order. *Barton v. Barton*, 2d Dist. Greene No. 2016-CA-12, 2017-Ohio-980, ¶ 52, *Carpenter v. Carpenter*, 12th Dist. Butler No. CA2013-05-083, 2013-Ohio-4980, ¶ 8. (" 'Final orders are those that dispose of the whole case or some separate and distinct subdivision of it while leaving nothing for future determination.' "). For these reasons, we find that Jason's new motion has not been denied and it is still pending for future, separate action. Therefore, Jason's first assignment of error is overruled.

*Second Assignment of Error*

**{¶34}** In his second assignment of error, Jason argues that the trial court erred when it selected Meaghan as residential parent of J.B. for school placement purposes.

Standard of Review

**{¶35}** This Court reviews a decision regarding parental rights for an abuse of discretion. *King v. King*, 3d Dist. Union No. 14-11-23, 2012-Ohio-1586, ¶ 9, citing *Ralston v. Ralston,* 3d Dist. Marion No. 9–08–30, 2009–Ohio–679, ¶ 13, citing *Davis v. Flickinger,* 77 Ohio St.3d 415, 1997–Ohio–260. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983). "The

reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis* at 418. The Supreme Court of Ohio has stated that this standard "is even more crucial in a child custody case." *Id.* at 419.

Relevant Authority

{¶36} When making a determination regarding parental rights, the domestic relations court must follow statutory guidelines. *Miller v. Miller,* 37 Ohio St.3d 71, 74 (1988). "Revised Code 3109.04 governs court awards of parental rights and responsibilities, as well as the modification of shared parenting agreements." *Ralston* at ¶ 16. This Court has previously determined that R.C. 3109.04(E)(2)(b) applies when the domestic relations court modifies the designation of a residential parent for school purposes, but otherwise maintains both parents as residential parents with the same parental rights and responsibilities. *Id.* at ¶ 17. Revised Code 3109.04(E)(2)(b) provides:

> **The court may modify the terms of the plan for shared parenting approved by the court and incorporated by it into the shared parenting decree upon its own motion at any time if the court determines that the modifications are in the best interest of the children or upon the request of one or both of the parents under the decree. Modifications under this division may be made at any time. The court shall not make any modification to the plan under this division, unless the modification is in the best interest of the children.**

Case No. 14-20-24

{¶37} When determining the child's best interest, the court should consider the factors in R.C. 3901.04(F)(1), which include:

(a)   The wishes of the child's parents regarding the child's care;

(b)   If the court has interviewed the child in chambers pursuant to (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes, and concerns of the child, as expressed to the court;

(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d)   The child's adjustment to the child's home, school, and community;

(e)   The mental and physical health of all persons involved in the situation;

(f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g)   Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h)   Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving an act that resulted in a child being an abused or a neglected child * * *;

(i)   Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

-16-

**(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

Analysis

**{¶38}** At the outset, we note that this is not a case where the parents regularly disparage each other. Both parents get along well enough to continue to engage in a SPP and both parents want the SPP to continue. However, due to the distance between the parents, a decision had to be made as to where J.B. would attend school. Both parents wanted J.B. to attend school in their respective area, thus the trial court had to make a difficult decision between two capable and loving parents.

**{¶39}** In order to make its determination, the trial court analyzed the statutory best interest factors in R.C. 3901.04(F)(1). Under its analysis, the trial court determined that both parents sought to be named residential parent for school placement purposes (factor (a)). The trial court noted that J.B. was not interviewed *in camera* (factor b); however, the GAL initially expressed that Jason would be the better option for residential parent for school placement purposes. The trial court conducted the following analysis in disagreeing with the GAL.

> **The GAL has recommended that Father be named school residential parent with Mother being given liberal parenting time. The GAL's recommendation is based primarily upon two considerations (1) consistency; and (2) family support. The GAL found that consistency is important in this child's life. In the GAL's analysis, [J.B.] has lived in Father's house all her life. The GAL finds this consistency to be a determining factor. Mother astutely points out that since the child was three, she has lived in**

-17-

> **both Father's home and Mother's home an equal amount of time. Accordingly, consistency as it relates to residence, would be equivalent regardless which parent is named school residential parent.**
>
> **The GAL finds that Father has a better support system in the event of emergencies. He lives [or lived] in the lower level of his parent's home. Consequently, paternal grandparents are always there to watch [J.B.]. His sister also lives nearby. In the GAL's analysis, Mother's support system is comprised of individuals who may be significant in Mother's life, but are not blood relatives. Apparently, this factor weighs heavily in the GAL's analysis.**
>
> **The Court agrees that a support system is significant when parenting children. The Court is not as focused as the GAL on whether that support system is comprised of blood relatives. Excellent support systems comprised of caring, competent and loving adults are as effective as those comprised of blood relatives. Quite often parents rely on neighbors, friends, work mates or church members to comprise effective support systems. Mother's support system is comprised of her Husband, who is home most of each day. Mother's support system also includes her Husband's parents and nearby family. The Court finds that both parents have acceptable support systems each can rely upon in the event of exigent circumstances.**

(Doc. No. 119).

{¶40} With regard to factor (c), the trial court noted that J.B. had a good relationship with both parents and extended families, and with regard to factor (d) the trial court's analysis indicated J.B. was adjusted to both homes. Further, both parents were determined to be in good physical and mental health[5] (factor (e)).

---

[5] Jason disputes this due to issues Meaghan has had in the past with, *inter alia*, anorexia but there are no indications of any current issues.

-18-

{¶41} With regard to factor (f), and the parent more likely to honor and facilitate parenting time, the trial court noted some issues with Jason failing to offer Meaghan the right of first refusal for parenting time. The trial court found that this failure on Jason's behalf illustrated some continuous denial of Meaghan's rights (factor i). The trial court found that factors (g), (h), and (j) were not relevant here.

{¶42} After reviewing the evidence and the appropriate legal factors, the trial court found that

> **The determining factor in the Court's analysis is that Mother stands ready to modify her work schedule so she can essentially become a stay at home mom. With Mother as school residential parent, she will be home to care for her daughter at all hours. Mother will be home in the event the child becomes ill at school, or cannot go to school due to illness. She will be there to take her to school and pick her up. She will be available to monitor her daughter's progress both educationally and socially. Although Father testified that he has more flexibility in his new job, the Court finds Father'[s] testimony less credible regarding his availability. Father's testimony was that he spends 4-6 hours per day out of the house at work. Father's testimony appears contrived in order to justify not offering his ex-Wife first refusal.**
>
> **If Father were designated school residential parent, there is a substantial likelihood that parenting of this child would be delegated to paternal Grandparents. In this instance, everyone agrees that both Mother and Father are good, loving and suitable parents. The Court finds that despite being loving Grandparents, there is no need to delegate parental responsibility when a perfectly suitable parent is available 24/7 to raise her daughter. The Court finds that it is in [J.B.]'s best interest that Mother be designated school residential parent. Despite designating Mother school residential parent, the Court finds Father is deserving of a prominent place in his daughter's life. He will have substantial**

**parenting time so as to maintain the strong Father/Daughter bond.**

(Doc. No. 119).

{¶43} Jason now argues that the trial court's determination was an abuse of discretion because he was "not the reason" that this matter was before the court, blaming Meaghan's move. Further, he argues that the trial court failed to consider the living arrangements of J.B., the bond J.B. had with her grandparents, and the "constant" work changes of Meaghan.

{¶44} However, in our review of the trial court's lengthy entry, we find that the trial court carefully weighed the factors at issue and came to a difficult decision between two good parents. There was never going to be a "winner" in this scenario, just the parent designated to be the residential parent for school placement purposes.

{¶45} Moreover, by all indications the trial court did consider J.B.'s living situation and her bonds. In fact there was a supplemental hearing that established that the home Jason is claiming J.B. was so attached to has since burned down. Further, the supplemental hearing showed that Meaghan had gone to PRN status as she stated she would. Importantly, the trial court was persuaded by the fact that Meaghan would be available at all times to J.B. and the trial court specifically found Jason's claims regarding his availability specious.

{¶46} A trial court's determination regarding custody must be given the "utmost respect." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). Given the trial

court's clear analysis of the issues and factors presented in this case, we cannot find that there was an abuse of discretion by naming Meaghan residential parent of J.B. for school placement purposes. Evidence was presented that supports the trial court's difficult decision in this matter. Therefore, Jason's second assignment of error is overruled.

*Third Assignment of Error*

{¶47} In Jason's third assignment of error he argues that the trial court erred by awarding Meaghan attorney's fees related to the "eleventh hour" continuance of the supplemental hearing. More specifically, he argues that this case did not contain an allegation of frivolous conduct or a finding of frivolous conduct.

Standard of Review

{¶48} A determination as to whether to award attorney fees in a domestic relations case is left to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Graham v. Graham*, 3d Dist. Union No. 14-19-18, 2020-Ohio-1435, ¶ 20, *Cichanowicz v. Cichanowicz*, 3d Dist. Crawford No. 3-13-05, 2013-Ohio-5657, ¶ 92.

Analysis

{¶49} A total of $622.50 was awarded to Meaghan in attorney's fees in this case pursuant to R.C. 3105.73(B), which reads as follows.

> **In any post-decree motion or proceeding that arises out of an action for divorce, dissolution, legal separation, or annulment of**

**marriage or an appeal of that motion or proceeding, the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate, but it may not consider the parties' assets.**

According to R.C. 3105.73(C), "The court may make an award of attorney's fees and litigation expenses under this section *in addition to making an award of attorney's fees and litigation expenses under any other provision of the Revised Code or of the Rules of Civil Procedure.*" (Emphasis added.)

{¶50} Based on the plain statutory language, attorney's fees can be awarded under R.C. 3105.73 separate from, or in addition to, other statutory subsections and the civil rules. Thus on appeal where Jason claims that the trial court needed to find frivolous conduct under R.C. 2323.51 before awarding attorney's fees, he is mistaken. That statute provides an additional, separate method for awarding attorney's fees. Therefore this argument is not well-taken.

{¶51} As to the attorney's fees that were awarded in this case under R.C. 3105.73, Meaghan's attorney filed a request for fees at the direction of the magistrate. The fees were specifically limited to preparation for the June 29, 2020, supplemental hearing that had to be continued due to Jason's late motion. As part of her motion, Meaghan's attorney submitted an itemized invoice for $810. The magistrate reviewed the invoice and found that one hour was spent on issues

unrelated to preparation for the June 29, 2020 supplemental hearing, thus the bill was reduced by that hour of billing to the amount of $622.50.

{¶52} Jason objected to the magistrate's award of attorney's fees and the trial court reviewed the matter under R.C. 3105.73(B). The trial court found that the award was equitable, conducting the following analysis.

> **The backdrop upon which this action proceeds must be considered. The contentious nature of the proceedings, including testimony regarding Paternal Grandparent interference, the fact that the trial date had been set months in advance with participation by counsel, coupled with an unsubstantiated eleventh hour allegation of sexual abuse, all weighed in favor of granting the award. Under the particular circumstances of this case, the Chief Magistrate found it inequitable for Mother to pay twice for trial preparation. Considering the equities involved, the Court finds it equitable for Father to pay the attorney fees as Ordered. Father's motion to set aside the Magistrate's Order is without merit.**

(Doc. No. 117).

{¶53} On appeal, Jason seems to largely take issue with the trial court's determination that the allegations against the stepfather were unsubstantiated when a hearing on the matter had not been held. He claims that when the continuance was requested, this information was unknown. However, after reviewing the matter, the trial court found that the claims had been investigated and were found to be unsubstantiated. Further, the trial court found that the late hour of the allegation and the ongoing legal animosity necessitated an award here. In addition, the supplemental hearing had been set for a long time and it was covering limited issues,

-23-

begging the question of why a continuance was necessary for those limited purposes based on an unrelated issue.

{¶54} To the extent that Jason argues that Meaghan did not present testimony that her fees were "reasonable" in this case, Ohio Appellate Courts awarding attorney's fees under R.C. 3105.73 have generally held that " '[a] trial court may also use its own knowledge and experience when evaluating the nature of the services rendered and the reasonableness of the fees charged.' " *Miller v. Miller*, 6th Dist. Sandusky No. S-16-27, 2017-Ohio-7646, ¶ 33, quoting *Falk v. Falk*, 10th Dist. Franklin No. 08AP-843, 2009-Ohio-4973, ¶ 39 (analyzing attorney's fees under R.C. 3105.73(A) rather than (B)). "Further, of these cases, those in which an award of attorney's fees was found to be inappropriate involved situations where no supporting documentation—such as an invoice, a billing statement, or records of hourly rates—was submitted for the trial court to evaluate." *Id*. citing, *inter alia*, *Miller* at ¶ 34. Here an invoice was submitted and evaluated by the trial court.

{¶55} Given the broad discretion trial courts are vested with to award attorney's fees, particularly in domestic relations cases, we cannot find that there was an abuse of discretion in this case. Attorney's fees were awarded under a very specific statute for a *very limited purpose*. *See Graham*, *supra*, at ¶ 21. For all of these reasons, Jason's third assignment of error is overruled.

*Conclusion*

**{¶56}** For the foregoing reasons Jason's assignments of error are overruled and the judgment of the Union County Common Pleas Court is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**